IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 25-523** |
| **ISAIAH ADAMS** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant, Isaiah Adams, was one of numerous basketball players charged and adjudged guilty in a far-reaching bribery, fraud, and point-shaving scheme. The defendant fixed games while playing for the State University of New York at Buffalo Bulls Men's Basketball Team ("Buffalo"). The scheme corrupted the integrity of National Collegiate Athletic Association ("NCAA") Division I men's basketball and caused substantial losses to victims of the scheme.

The scope of the scheme was extraordinary. The scheme involved more than 39 players on more than 17 different NCAA basketball teams who fixed and attempted to fix more than 29 games. The scheme resulted in more than $3 million in fraudulent wagers placed on these games, and more than $1.1 million in financial losses to sportsbooks throughout the country. But the harm extends well beyond the dollars lost. The leaders of this scheme, along with the players they recruited, corrupted the fundamental principles on which competitive sports depend—fairness, honesty, and respect for the rules of competition—and they did so because of greed.

The corrupt players in this case, like Adams, dedicated their lives to competitive sports, reached the pinnacle of college basketball, earning NCAA Division I scholarships, and were among the top college basketball players in the country. Given their status as scholarship student-athletes, they occupied a position of prominence and trust within their universities, and

their teammates, coaches, and fans relied on them to compete honestly. Instead, the corrupt players betrayed that trust and compromised the integrity of the competition for personal financial gain, choosing to accept bribe payments to fix games. Their criminal conduct ran contrary to everything they had been taught about fair competition and sports. They harmed the NCAA, the schools and athletic programs they represented, as well as their fellow players and coaches who played by the rules, and the fans who looked up to them. These corrupt players knowingly agreed to abuse the very position and opportunities they had worked to attain by underperforming in games for money.

Adams helped fix multiple games as a player on Buffalo. The fixers successfully wagered close to $400,000 on those games and paid the players close to $70,000 in bribes. Such conduct calls for serious punishment within the applicable guideline range of 18-24 months in prison.

## I. SUMMARY OF CRIMINAL CONDUCT

### A. The Bribery, Fraud, and Point-Shaving Scheme Generally

Beginning in or about September 2022, a group of individuals worked together to recruit and bribe players to help influence or "fix" Chinese Basketball Association ("CBA") games through "point shaving" during the 2022-2023 season. The fixers bribed CBA players to fix games and then, through various gambling outlets, placed large wagers on those games against the teams whose players they had bribed. The fixers involved in this CBA aspect of the scheme included Antonio Blakeney, Marves Fairley, and Shane Hennen.

After profiting on the fixed CBA games, the fixers turned their attention to NCAA men's basketball games. During the 2023-2024 and 2024-2025 NCAA men's basketball seasons, the fixers agreed to recruit NCAA players who would accept bribe payments in exchange for helping

to influence outcomes of NCAA basketball games. In particular, the fixers agreed to recruit into the scheme players who would help ensure that their team failed to cover the spread of the first half of a game or an entire game. The fixers would then place wagers on those games through the gambling outlets, betting against the team whose player or players they had bribed to engage in this point-shaving scheme.[1] Because of the proliferation of legalized sports betting, the fixers could use numerous gambling outlets to make their bets on these games and conceal the scheme from authorities. The fixers also expanded the group of individuals involved in leading the scheme, fixing games, and recruiting players to participate in the scheme. Those additions included, among others, Jalen Smith, Roderick Winkler, and Alberto Laureano.

Five of the fixers, Jalen Smith, Antonio Blakeney, Marves Fairley, Roderick Winkler, and Alberto Laureano, then approached and communicated with NCAA basketball players, in person and through social media and cellular telephone calls. In these communications, the fixers offered the players bribe payments, usually ranging from $10,000 to $30,000 per game, to participate in the scheme. The fixers also attempted to recruit multiple players from a team to join the bribery scheme and further ensure its success. Many of these players accepted the offers and agreed to help fix specific games so that the fixers would win their wagers. The fixers targeted for their scheme NCAA basketball players for whom the bribe payments would meaningfully supplement or exceed legitimate NIL opportunities.

[1] Obtaining complete information on bets placed by individuals is impossible. There are numerous betting outlets in the United States and elsewhere, legal and illegal, and numerous ways to make bets that cannot be traced. The government has identified in this memorandum and seeks to hold the defendant responsible (as set forth in the stipulations in the plea agreement) only for the bets that it could find that were attributable to the scheme.

Smith, Blakeney, Fairley, Winkler, and Laureano had credibility with many of the players and could approach them to engage in this scheme because of their prominence, experience, and reputation in local and national basketball communities. Smith was a resident of North Carolina who was active in the training and development of basketball players for professional scouting combines. Blakeney was a resident of Florida and a former McDonald's All-American and college basketball player who also played professional basketball in the National Basketball Association ("NBA") and overseas and who had himself accepted bribes from his co-schemers to underperform in CBA games. Fairley was a resident of Mississippi and a high-stakes sports gambler, social media influencer, and sports handicapper who sold betting advice to others. Winkler was a resident of Arkansas and a former coach and trainer for high school and Amateur Athletic Union ("AAU") basketball teams and players. Laureano was a resident of New York and a former college basketball player.

As the fixers had agreed, Smith, Blakeney, Fairley, Winkler, and Laureano then communicated with the NCAA basketball players who had agreed to participate in the bribery scheme and directed them to underperform or otherwise help influence the outcome of particular games or a specific portion (generally the first half) of particular games.

Smith, Blakeney, Fairley, Winkler, Laureano, and Shane Hennen, a resident of Philadelphia and Nevada and a high-stakes sports gambler, as well as other co-schemers, then placed bets with numerous gambling outlets on NCAA men's basketball games involving the bribed NCAA players. They placed these bets in a manner that was consistent with the way in which they had arranged to fix the outcome of a game, or a portion of a game, to maximize their chances of winning their wagers. The bribed NCAA players then influenced, attempted to

influence, and conspired to influence the outcome of their games through intentionally poor performances, removing themselves from games, supporting their teammates who were also involved in the scheme, and through other means.

At times, while Hennen was in the Eastern District of Pennsylvania, the other fixers communicated and strategized about the scheme with Hennen, and Hennen placed bets on the fixed games with online gambling outlets and in person at casinos. At least one of those fixed games occurred in the Eastern District of Pennsylvania. In addition, individual bettors unaware of the scheme placed bets on the fixed games, often on the other side of the fixers' bets, in the Eastern District of Pennsylvania, resulting in losses to the individual bettors.

When the fixers were successful with their wagers on fixed games, Smith and other co-schemers traveled to NCAA school campuses and made cash bribe payments to the players who had agreed to participate in the scheme. On at least one occasion, Smith traveled to the Eastern District of Pennsylvania through the Philadelphia International Airport to pay one of the bribed players.

**B. <u>Adams' Involvement in the Bribery and Point-Shaving Scheme</u>**

Adams participated in this scheme as a player on the State University of New York at Buffalo Bulls Men's Basketball Team ("Buffalo"). Around late February 2024, the fixers, including Smith, Fairley, Laureano, and Blakeney, recruited multiple players on the Buffalo men's basketball team to participate in the point-shaving scheme. Those players included Isaiah Adams, as well as Shawn Fulcher, charged in this Court by indictment (Crim. No. 26-23), and Person #5 (as identified in the indictment). Fulcher helped recruit Adams to participate in the scheme, and both of those players helped recruit their teammate, Person #5.

In late February 2024, Smith and Blakeney discussed the scheme with Adams, Fulcher, and Person #5, on FaceTime calls. During these calls, the players agreed, in exchange for bribe payments, to underperform in and influence an upcoming game against the Western Michigan University Broncos Men's Basketball Team ("Western Michigan"). In particular, the players agreed to help ensure that Buffalo failed to cover the first-half spread in the Western Michigan game.

On February 24, 2024, Buffalo played against Western Michigan in an NCAA men's basketball game at the University Arena in Kalamazoo, Michigan. Western Michigan was favored over Buffalo by approximately 3 points in the first half. Before this game, the fixers, including Fairley and Winkler, and others acting at their direction, placed wagers with various sportsbooks totaling at least approximately $90,000 on Western Michigan to cover the first-half spread.

In the process of fixing this game and placing these wagers, Fairley, Winkler, and Blakeney, and others involved in the scheme communicated via text about the scheme and their wagers. For example, on or about the date of the game, Fairley texted a straw bettor and an illegal bookmaker, "Western Michigan first half." Blakeney also engaged in text communications with Fairley shortly before the game. Blakeney told Fairley, for example, that he "need[ed] to get on [the] phone with buffalo tonight" and "shoot the number," meaning that he needed to tell the Buffalo players the spread for the game. Fairley then provided Blakeney with information about the Buffalo players involved in the scheme and sent a screenshot with phone numbers belonging to Person #5 and Adams. Blakeney then told Fairley, "Let's get on phone with buffalo asap [as soon as possible]." After these text communications, on February 24,

2024, Fairley sent group text messages to Blakeney, his associates, and his bookie about betting on the fixed Buffalo game.

On February 24, 2024, in the NCAA men's basketball game between Buffalo and Western Michigan, Adams, Fulcher, and Person #5 underperformed in and helped facilitate the bribery scheme to ensure that Buffalo failed to cover the spread in the first half as they had agreed. Western Michigan outscored Buffalo 47 to 32 in the first half, and the fixers won their bets. Without the Buffalo players intentionally underperforming in and influencing the second half of the game, Buffalo played substantially better, with Western Michigan outscoring Buffalo by only 4 points, 44 to 40. Western Michigan won the game 91 to 72.

On February 24 and 25, 2024, after the Western Michigan game, Smith, Laureano, and Blakeney communicated via text with Adams, Fulcher, and Person #5 about delivering the players their bribe payments for that game. Smith, who was flying to Buffalo to make the payments, then texted with Fulcher to agree upon a location where Smith later delivered the bribe payments to the Buffalo players.

Shortly after the Buffalo game against Western Michigan, Smith, Fairley, Hennen, Winkler, and Blakeney arranged for the Buffalo players to fix their upcoming game against the Kent State University Golden Flashes Men's Basketball Team ("Kent State"). In particular, Smith and Blakeney engaged in a FaceTime call with Adams, Fulcher, and Person #5 in which the Buffalo players agreed to underperform in and help facilitate the bribery scheme to ensure that Buffalo failed to cover the first-half spread in the game against Kent State.

On February 27, 2024, Buffalo played against Kent State in an NCAA men's basketball game at the M.A.C. Center in Kent, Ohio. Kent State was favored over Buffalo by approximately

8.5 points in the first half. Before this game, the fixers, including Smith, Fairley, and Winkler, and others acting at their direction, placed wagers with various sportsbooks totaling at least approximately $424,000 on Kent State to cover the first-half spread.

On February 27, 2024, in the NCAA men's basketball game between Buffalo and Kent State, Kent State outscored Buffalo in the first half by 12 points, 39 to 27, and the fixers won their bets. With the score tied at 27 with 4:40 left to go in the first half of this game, Kent State scored the last 8 points of the half, and Buffalo did not score again. In the last 13 minutes of the first half, consistent with the bribery scheme, Adams, Fulcher, and Person #5 scored a total of 1 point, missing several shots, including layups and dunks, and committing several turnovers.

Shortly after the Kent State game, Smith, Fairley, Hennen, Winkler, and Blakeney communicated via text about the failed attempt to fix this game and the plan to fix the next Buffalo game. Consistent with this plan, from February 28, 2024, through March 2, 2024, Smith, Laureano, and Blakeney, as well as Adams and the other Buffalo players in the scheme, texted about Smith arranging for Laureano to deliver bribe payments to the Buffalo players. For example, on February 28, Smith texted the Buffalo players that he would "figure out what flight ima get from Vegas to buffalo[,] ima send yall my flight info like last time and keep yall updated." Fulcher placed a "loved" emoji on that message. Continuing in the same text chain, which included the Buffalo players as well as Blakeney and Laureano, on March 1, 2024, Adams asked, "We still good for tonight right?" Smith responded, "Y'all talked to Shawn?" Shawn Fulcher responded, "I forgot to tell em," and then said, "Bread [money] gon be here Saturday before or after the game . . ." Smith then attached a photograph of the interior of an airplane and told the Buffalo players, "Y'all getting 54k [$54,000]. . . ."

On March 2, 2024, at the direction of Smith, Laureano traveled to Buffalo to deliver approximately $54,000 in bribe payments to Adams, Fulcher, and Person #5 for their roles in fixing Buffalo men's basketball games. While Laureano was driving to Buffalo, he texted the players a photograph of the inside of his car, revealing a large stack of cash in an open compartment.

Shortly before Buffalo's next game on March 5, 2024, against the Ohio University Bobcats Men's Basketball Team ("Ohio"), Smith and Blakeney engaged in a FaceTime call with Adams, Fulcher, and Person #5. During this call, Smith directed the Buffalo players to ensure that Buffalo failed to cover the first-half point spread in the game against Ohio. At that time, Ohio was favored by approximately 5.5 points for the first half at sportsbooks throughout the United States and elsewhere. The players agreed to fix the game as directed.

Before the NCAA men's basketball game between Buffalo and Ohio on March 5, 2024, the fixers, including Fairley and Hennen, and others acting at their direction, placed wagers with various sportsbooks on Ohio to cover the first-half spread of approximately 5.5 points. To increase the profitability of their scheme, these wagers included "parlays" on this game along with other games that the schemers had fixed by bribing players.

On or about March 5, 2024, in the NCAA men's basketball game between Buffalo and Ohio at Alumni Arena in Buffalo, New York, Adams, Fulcher, and Person #5 underperformed in and helped facilitate the bribery scheme to influence the first half of the game as they had agreed. Ohio outscored Buffalo 40 to 33 in the first half, covering the spread of approximately 5.5 points, and the fixers won their bets.

## II. LEGAL STANDARD

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[2]

At the second step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent § 3553(a) factors in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the § 3553(a) factors.

## III. SENTENCING CALCULATION

### A. Statutory Maximum Sentence

The Court may impose the following statutory maximum sentence: For Count One, charging bribery in sporting contests, a term of imprisonment of 5 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100. Full restitution also may be ordered. Forfeiture of all proceeds from these offenses also may be ordered.

---

[2] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

### B. Sentencing Guidelines

Consistent with the Draft Presentence Investigation Report, the government agrees that the following sentencing guideline calculation should apply to this case, accounting for the 2026 Amendments to the Sentencing Guidelines:

Under USSG § 2B4.1, the base offense level for a violation of 18 U.S.C. § 224 (bribery in sporting contests) is 8. Under USSG §§ 2B4.1(b)(1) and 2B1.1(b)(1)(G), because the value of the improper benefit to be conferred from the bribes was more than $350,000 but less than $750,000, the offense level is increased by 12 levels. Under USSG § 3E1.1(a) and (b), the defendant timely accepted responsibility for his offense, resulting in a 3-level decrease to the offense level. Under USSG § 4C1.1, the defendant is a zero-point offender, resulting in a 2-level decrease to the offense level. *See* Draft Presentence Investigation Report at ¶¶ 73-83.

This results in a total offense level of 15. The defendant is in Criminal History Category I, yielding a sentencing guideline range of 18-24 months. Draft PSI ¶ 125.

## IV. GOVERNMENT'S SENTENCING RECOMMENDATION

### A. Sentencing Factors

A thorough consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that a guideline sentence is appropriate in this case. The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range.'" *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (*quoting Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general,

this system will steer district courts to more within-Guidelines sentences. *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id*.

In addition, the Court must also consider all the sentencing considerations set forth in § 3553(a).

**B. <u>Application</u>**

The relevant § 3553(a) factors will be discussed in turn.

**(1) The nature and circumstances of the offense**

The nature and circumstances of Adams' criminal conduct are serious. As discussed throughout this memorandum, Adams accepted thousands of dollars in bribes and joined with multiple teammates to fix multiple college basketball games. In doing so, Adams participated in a bribery scheme that involved millions of dollars in betting and resulted in at least $1.1 million in losses to the financial victims of the scheme. Adams also helped recruit one of the Buffalo players involved in the scheme, Person #5, increasing his culpability for participating in the scheme. Moreover, he helped to fix multiple Buffalo games, which were among the most lucrative in the scheme, generating approximately $400,000 in fraudulent winnings and corresponding losses to the sportsbooks. Because Adams' criminal conduct inflicted greater financial harm than several of his co-defendants, it is appropriate that he faces a higher guideline range.

The corruption and fraud involved in this case did tremendous damage to the integrity of NCAA basketball. Officials from the NCAA provided a written statement signed by Jonathan Duncan, the NCAA's Vice President of Enforcement, addressing the broad impact that this

conduct had on college sports—considering the perspectives of the different categories of people involved in college sports, such as the schools, the student athletes, the coaches, and the fans. The statement explains in detail how this conduct undermined the integrity of sports; degraded the efforts of student athletes who have spent their lives dedicated to their sport; and betrayed the trust of fans who believe the games they watch are decided on the court and not in FaceTime communications where bribery schemes are hatched. For example, Mr. Duncan explained:

> Impacting outcomes of college basketball games causes harm far beyond any single game, bet or financial transaction. When individuals intentionally influence the outcome of a sporting contest for gambling purposes, they undermine the integrity of competition. Student-athletes dedicate countless hours to training, preparation and competition with the expectation that contests will be conducted fairly. Contest manipulation devalues those efforts and unfairly disadvantages every participant who competes within the rules. Authentic competition is central to the student-athlete experience, and competition manipulation undermines the earnest efforts of teammates, coaches, opponents, schools and conferences. These are competitions young people have been preparing most of their lives for and may well be their last athletics opportunity at such a level.
>
> Fans must have confidence that the performances they spend money to attend or watch are conducted fairly and the outcomes are based only on ability. Those ticket and broadcast revenues enable NCAA schools to provide hundreds of thousands of college athletes tremendous benefits, including $4 billion in scholarships, as well as health and wellness support and countless hours of coaching, training, mentoring and development. Should fans question the integrity of the game, this entire system that provides unprecedented benefits to student-athletes is at risk.
>
> …
>
> Perhaps most importantly, conduct involving contest manipulation, such as the conduct involving bribery and game fixing as charged in this case, strikes at public confidence in sport. Fans, media partners, sponsors and the public engage with college sports because they believe competitions are fair, genuine and unscripted. If that confidence is lost, the damage extends beyond a single school or sporting event. The credibility of the broader college athletics system is called into question. The resulting reputational harm can have lasting detrimental effects on all student-athletes and schools, the public's trust in the game, and the college sports ecosystem as a whole.

This was obviously a serious crime involving corruption and fraud that had a substantial impact on the "college sports ecosystem as a whole," calling for appropriate punishment within the applicable guidelines.

**(2) The history and characteristics of the defendant**

The defendant's history and characteristics do not explain his criminal conduct in this case. He does not have a criminal record. While he had a challenging upbringing in many ways, he also had the constant support of his mother who helped him rise to the level of a Division I athlete. He did not experience any mistreatment or abuse. The defendant does not have a significant history of drug or alcohol abuse and no history of mental health issues. By all accounts, the defendant should have made better choices than to engage in this scheme and to do so with multiple basketball games. His decision to accept bribe payments and fix games for personal financial gain, at the expense of both his own integrity and the integrity of those games, demonstrates a profound lapse in judgment that is wholly inexplicable in light of his history and characteristics. Indeed, even those closest to him struggled to understand his actions. As reflected in the PSI, his mother stated that she was shocked and dismayed by her son's decision to become involved in this bribery scheme.

On the other hand, the defendant did admit to his misconduct and agreed to plead guilty early in the process. He has shown remorse. A sentence within guideline range is appropriate for this defendant, considering his history and characteristics.

**(3) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and**

**(4) The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

There is a strong need to impose a sentence that reflects the seriousness of these offenses, promotes respect for the law, and provides just punishment. The defendant's criminal conduct in this scheme, like that of most other players, was limited to the games he helped fix, and the parties agreed to a guideline range that fairly accounts for that conduct. A guideline sentence would thus promote respect for the law and justly punish the defendant for his criminal conduct.

The justice system must appropriately punish corruption and fraud, especially when crimes impact institutions that are important to the public. Crimes like this are difficult to detect, as evidenced by the length of time that the defendants engaged in the crimes here, making it even more essential that the sentence deter those who might engage in this type of criminal activity. A guideline sentence would appropriately send a message to athletes who might consider accepting bribes to fix their sporting events that they will face serious consequences for doing so.

As numerous courts have recognized, fidelity to the guidelines and imposing serious prison sentences serve a particularly important purpose in the area of white-collar crime. For instance, the Supreme Court in *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989), noted that the Senate Report on the Sentencing Reform Act "gave specific examples of areas in which prevailing sentences might be too lenient, including the treatment of major white-collar criminals." *Accord United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes...."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance

of "the minimization of discrepancies between white- and blue-collar offenses"). In *United States v. Martin*, the Court of Appeals for the Eleventh Circuit provided the following explanation:

> Our assessment is consistent with the views of the drafters of § 3553. As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white collar crime.' S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress was especially concerned that prior to the Sentencing Guidelines, '[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.' *Id.*

455 F.3d 1227, 1240 (11th Cir. 2006).

This is especially true here. The sentence imposed must communicate to the defendant and the public that the justice system will not tolerate this type of criminal activity. The best way to deter this defendant and others is to impose a guideline sentence.

**(5) The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to fashion a sentence that would provide the defendant with educational or vocational training. Thus, this statutory factor should not affect the Court's sentencing determination.

**(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in

judicial assignments. The recommended guideline sentence fairly considers this defendant's conduct and the circumstances of his case, and there is no basis to conclude that a sentence within the applicable guidelines range would result in any unwarranted disparities.

**(7) <u>The need to provide restitution to any victims of the offense.</u>**

This Court need not otherwise fashion a sentence that considers the need for the defendant to pay restitution. The government is seeking forfeiture and a fine from this defendant, rather than restitution.[3]

## V. <u>CONCLUSION</u>

For all the reasons set forth above, and subject to any additional information presented at the hearing and in the Sealed Supplement, the government respectfully requests that the Court impose a sentence within the guideline range of 18 to 24 months. The government also requests that this Court order forfeiture of $17,500 as set forth in the government's motion for a

---

[3] Restitution is not mandatory for the sports bribery offense to which the defendant pleaded guilty. Although the Court has discretion to order restitution, the government does not recommend that restitution be imposed on the defendant-players, including Adams, because allocating victim losses to individual players would involve significant complexity and risk inequitable results. As discussed above, the defendants' conduct caused losses to numerous victims, including sportsbooks and casinos. When calculating losses to casinos from the entire scheme, the government has already offset those losses by the amounts casinos gained from the fixers' failed bets. The defendant-fixers who pleaded guilty to wire fraud are jointly and severally liable for those net losses. Attempting to calculate restitution separately for individual defendant-players, each of whom participated in only a subset of fixed games, could produce inconsistent and anomalous financial penalties among the players and, in some instances, result in victim-casinos receiving more than their actual losses.

preliminary order of forfeiture and impose a fine within the guideline range of $7,500 to $75,000.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Louis D. Lappen*
LOUIS D. LAPPEN
JEROME M. MAIATICO
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been filed on ECF and served via email upon:

Todd Fiore, Esq.
834 Chestnut Street #206
Philadelphia, PA 19107
tfiorelaw@gmail.com

*/s/ Louis D. Lappen*
LOUIS D. LAPPEN
Assistant United States Attorney

Date: November 6, 2026