**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | **Crim. No. 2:25CR00523-NIQA** |
| | : | |
| **ISAIAH ADAMS** | : | |
| | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Isaiah Adams, through his court-appointed counsel Todd Fiore, Esq., respectfully submits this Sentencing Memorandum in anticipation of his upcoming sentencing hearing. Mr. Adams requests that this Honorable Court exercise its discretion under 18 U.S.C. § 3553(a) to vary downward from the advisory United States Sentencing Guidelines range of 18 to 24 months.

Mr. Adams stands before the Court deeply remorseful for his actions. In light of his exceptionally difficult upbringing, his otherwise unblemished record as a zero-point offender, his minor and reluctant role in a massive nationwide scheme, and the absolute lack of prior criminal history, a sentence of probation is sufficient, but not greater than necessary, to satisfy the statutory purposes of sentencing.

## I. INTRODUCTION

On December 11, 2025, a federal Information was filed charging Isaiah Adams with bribery in sporting contests and aiding and abetting in violation of 18 U.S.C. §§ 224

and 2. These charges stemmed from a sports-betting scheme orchestrated by outside individuals to influence the outcomes of NCAA basketball games during Mr. Adams' senior year at the State University of New York at Buffalo.

On February 18, 2026, Mr. Adams appeared before this Honorable Court, waived prosecution by Indictment, and pled guilty to Count 1 of the Information.

As the Court fashions its sentence, it must apply the streamlined two-step sentencing process mandated by the November 1, 2025, amendments to the Sentencing Guidelines. This modern legal framework demands an individualized evaluation, where advisory benchmarks yield directly to the unique history and human characteristics of the defendant under § 3553(a).

## II. <u>DEFENDANT'S BACKGROUND AND LIFE CIRCUMSTANCES</u>

Isaiah Adams is a 24-year-old man who overcame immense childhood adversity to become a first-generation college graduate. Until this isolated lapse in judgment, his life history was defined by an unyielding dedication to his family and his athletic craft.

### Family History and Upbringing

Mr. Adams was born in Norfolk, Virginia, to Phillip and Tiffany Adams. His parents separated when he was three years old, and his father largely abandoned the family to start a new one. After his father ceased paying child support, seven-year-old Isaiah, his mother, and his sister became entirely homeless in Jacksonville, Florida. For approximately 16 months, the family lived in a transitional women's shelter.

Growing up on the east side of Jacksonville, Mr. Adams was constantly surrounded by neighborhood violence and poverty. However, he insulated himself from

these dangers through basketball, playing at a local park and dedicating himself to sports to stay off the streets. He was recognized as Florida's "Mr. Basketball" in 2020 for his outstanding athletic achievements. His mother describes him as a "very quiet" and "reserved" young man who has never been in any sort of trouble.

**Personal Life, Children, and Relationships**

Mr. Adams is single, has no children, and is known by his family and coaches to be quiet and keep to himself. He currently resides in Florida with his mother's stepfather. When he is not playing or training for basketball, he enjoys playing video games.

**Physical Health and Medical History**

Mr. Adams has endured multiple severe physical injuries from his athletic career, including a hairline fracture to his back, a burst bursa in his left elbow, tendonitis in his knees, and a recent fracture to his right foot sustained in June 2026. Because he lacks health insurance, his foot fracture has gone untreated, severely hampering his ability to continue playing professional basketball.

The public exposure of this federal prosecution has caused Mr. Adams severe anxiety and depression. He has been publicly disgraced in his hometown and received horrific death threats on social media from angry bettors. He previously used marijuana to cope but ceased entirely in January 2026 prior to his pretrial supervision. Today, he relies on his faith and close relationship with his mother to endure this dark time.

**Education, Vocational Skills, and Employment Record**

Despite his unstable upbringing, Mr. Adams maintained a strong commitment to his education. He graduated in the top 100 of his high school class and ultimately earned

a Bachelor's degree in Psychology from the University of Toledo in May 2025. After college, he successfully secured contracts to play professional basketball overseas, including in Cyprus, Azerbaijan, and Mongolia, though his recent foot injury has paused this career trajectory. He hopes to eventually use his degree and basketball experience to start a non-profit organization to help the homeless, mirroring the struggles he overcame as a child.

## III. POST-BOOKER SENTENCING IN THE THIRD CIRCUIT AND THE 2025 AMENDMENTS

The legal landscape for federal sentencing in the Third Circuit has undergone its most significant transformation in two decades with the adoption of the 2025 Guideline amendments. To properly fashion a sentence for Mr. Chambers, the Court must apply this new framework while adhering to the foundational principles of 18 U.S.C. § 3553(a).

### A. The Transition from Three Steps to Two

For nearly twenty years following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Gunter*, 462 F.3d 237 (3d Cir. 2006), sentencing courts in this Circuit followed a rigid three-step process: (1) calculating the guideline range; (2) ruling on formal departure motions; and (3) considering the § 3553(a) factors to determine if a variance was warranted.

Effective November 1, 2025, the United States Sentencing Commission amended USSG §1B1.1 to streamline this procedure into a two-step process. The "departure" step

as a distinct legal requirement has been eliminated from the operative text of the guidelines, though the underlying rationales for those departures remain relevant considerations at the second step.

This change acknowledges the reality that since the guidelines became advisory, the vast majority of non-guideline sentences are imposed as variances under the court's broad discretion. The Commission’s intent was to make the process "outcome neutral" while reducing the procedural complexity that often led to unnecessary litigation over the distinction between departures and variances.

### B. Substantive Reasonableness and Judicial Discretion

Under the parsimony principle enshrined in 18 U.S.C. § 3553(a), this Court is mandated to impose a sentence that is "sufficient, but not greater than necessary" to fulfill the statutory goals of retribution, deterrence, public protection, and rehabilitation. The advisory Guidelines carry absolutely no presumption of correctness or inherent reasonableness. District judges possess sweeping discretion to depart from the calculated range based on individual mitigating data or deep policy disagreements with specific enhancements.

## IV. APPLICABLE CONSIDERATIONS PRIOR TO SENTENCING

In accordance with Step One of the modernized sentencing protocol, the Court must calculate the baseline advisory guidelines driven by the underlying offense conduct.

### A. Base Offense Level and Underlying Offense

In accordance with Step One of the modernized sentencing protocol, the Court

must calculate the baseline advisory guidelines driven by the underlying offense conduct.

Base Offense Level: 8 points, pursuant to USSG §2B4.1(a). Specific Offense Characteristic (Value): +12 points are added pursuant to USSG §§2B4.1(b)(1) and 2B1.1(b)(1)(G) because the collective value of the improper benefit to be conferred from the scheme was $399,237.11. Acceptance of Responsibility: -3 points are subtracted pursuant to USSG §3E1.1(a) and (b) because the defendant accepted responsibility and provided timely notification of his intent to plead guilty. Zero-Point Offender Adjustment: -2 points are subtracted pursuant to USSG §§4C1.1(a) and (b) because the defendant meets all required criteria.

Total Guideline Recapitulation Total Offense Level: 15 Criminal History Category: I (0 total criminal history points) Advisory Guideline Range: 18 to 24 months of imprisonment

## V. IMPORTANT FACTORS TO CONSIDER PURSUANT TO § 3553(a) AND VARIANCES

While Step One establishes an advisory baseline of 18 to 24 months, an uncritical application of this range would result in a sentence that violates the statutory mandates of § 3553(a). Multiple compelling factors justify a comprehensive downward variance to a probationary sentence.

### A. Highlighting Key § 3553(a) Factors in Andrews' Record

**1) History and Characteristics of the Defendant (§ 3553(a)(1))**:

Mr. Adams enters this court as a 24-year-old first-time offender with a criminal history score of zero. He survived childhood homelessness to become a college-educated

athlete. The meager $2,000 to $3,000 he personally gained from this offense was not spent on lavish luxuries; rather, he used it to help support his younger siblings and repair his mother's vehicle. This is an individual who spent a period of time as a child being homeless and in and out of a shelter.

**2) Nature and Circumstances of the Offense (§ 3553(a)(1))**:

Mr. Adams was not the mastermind of this sophisticated sports-betting scheme. He did not seek out these “fixers” to facilitate this crime. He was a young, unpaid collegiate athlete on a team with a 1-9 record who was actively recruited by teammates and powerful outside "fixers". Initially, Mr. Adams outright refused to participate, telling his teammate "No, I respect the game too much to do that". He only relented after continuous pressure, rationalizing that the team was likely going to lose anyway, though he steadfastly maintains he still played with the personal intention to win. Furthermore, after participating in a few games, Mr. Adams voluntarily walked away and refused to continue, telling the recruiters he was "done".

Isaiah Adams was an easy target for the “fixers” as his financial situation throughout his entire life was rather dire. The “fixers”, knowingly preying on vulnerable unpaid student athletes, manipulated them by devising a scheme where the players did not intentionally have to lose the game outright. These “fixers”, having themselves played the game, understood that it would take a lot more money and convincing to have the players intentionally lose the entire game.

The “fixers” devised a scheme targeting a team that was having a terrible season. A 1-9 record made it extremely unlikely that Buffalo would be competing for a conference title and/or an “at-large” bid to the NCAA Division I Men’s Basketball Tournament. By

telling these players that they did not have to lose the game, just the first half, manipulates the players into a false sense that what they are doing is not as morally corrupt as "throwing the entire game".

The "fixers" knew that they had a much better chance of getting player participation if: 1) the players were on a bad team, 2) they targeted unpaid players who were getting no Name Image and Likeness (NIL) money, and 3) devised a scheme where the players could still win the game as long as they just lost the first half by a certain number of points. Counsel is not suggesting that the behavior is justifiable, but telling a young unsophisticated indigent student athlete on a bad team that he can make some money he can send home to his struggling family, and not have to lose the game, is a tempting proposition.

This is not an excuse or justification for what happened, but the reality of the situation is that legalizing sports gambling, particularly for college sports, was a recipe for disaster that was absolutely foreseeable and preventable. Legalized sports gambling has led to several high-profile professional athletes being charged for similar conduct. These professional athletes were already making millions of dollars or at the very least hundreds of thousands of dollars and still participated in this conduct. Isaiah Adams never had access to that type of money, and his childhood background of abject poverty should be taken into consideration for why this happened when fashioning a sentence.

**3) Protection of the Public and Recidivism Risk (§ 3553(a)(2)(C))**:

Mr. Adams poses zero risk to the public. He is a zero-point offender whose career and public reputation have already been decimated by this prosecution. The deterrence value of this conviction has already been fully realized.

**VI. CONCLUSION**

Isaiah Adams made a terrible error in judgment when he was a 22-year-old college student with no financial resources. He has taken full responsibility for his conduct, suffered the total collapse of his public reputation, and lost the athletic career he spent his entire life building to escape poverty.

He does not ask this Court to ignore his conduct but rather asks for a sentence that honors his humanity, recognizes his extraordinarily difficult upbringing, and accounts for his minor and reluctant role in the larger conspiracy.

For the reasons set forth above, Isaiah Adams respectfully requests that this Honorable Court vary downward from the advisory guideline range and impose a sentence of probation.

Respectfully submitted,

TODD FIORE, ESQ.
Attorney for Defendant, Isaiah Adams

**<u>CERTIFICATE OF SERVICE</u>**

I, Todd Fiore, Esq., attorney for the Defendant, hereby certify that I have served copies of the Defendant’s Sentencing Memorandum to the Honorable Nitza I. Quinones Alejandro and AUSA Jerome Maiatico, Esq and AUSA Louis Lappen, Esq.

TODD FIORE, ESQ.
Attorney for Defendant, ISAIAH ADAMS

DATE: NOVEMBER 11, 2026